UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Michelle Audette, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 1:14-cv-13692-WGY |
| v. | ) |
| | ) |
| Town of Plymouth, et al | ) |
| | ) |
| Defendant. | ) |

PLAINTIFF MICHELLE AUDETTE'S MEMORANDUM IN OPPOSITION TO
DEFENDANT TOWN OF PLYMOUTH'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In this action the plaintiff, Michelle Audette, seeks redress for substantial violations of 42 U.S.C §12101 et seq., commonly known as the Americans with Disabilities Act of 1990 ("ADA"); "violation of §504 of the Rehabilitation Act;" as well as violations of her rights under the Massachusetts anti-discrimination laws, M.G.L. c. 151B. Defendant, Town Of Plymouth and the Plymouth Police Department ("Plymouth" or "Department") by and through its agents and employees have violated Massachusetts General Law Chapter 151B in connection with its employment of Michelle Audette ("Audette" or "Plaintiff"), a Police Officer, with the Plymouth Police Department. Specifically, the Defendants, by and through its employees, discriminated against Plaintiff on the basis of disability and perceived disability and based upon her age and gender.

II. **STANDARD OF REVIEW**

Rule 56(c) of the Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, provides that they shall not be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law. Sands v. Ridefilm Corp., 212 F.3d 657 (1st. Cir. 2000). A genuine issue of material fact exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Government Development Bank of Puerto Rico, 27 F.3d 746 (1st. Cir. 1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Savings Bank, 54 F.3d 27

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.' ". Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st. Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st. Cir. 1995)). "'Credibility issues fall outside the scope of summary judgment." The First Circuit Court has held that courts should not engage in credibility assessments at the summary judgment stage. Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st. Cir. 2000).

A. **Plaintiff has Established a Handicap Discrimination under the ADA, FHA and G.L. c. 151B.**

The Americans with Disabilities Act ("ADA") provides that it is unlawful for a covered employer to discriminate against a qualified individual on the basis of disability in regards to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment. 42 U.S.C. § 12112(a). "Disability" is defined under the ADA as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. *§ 12102(1)*. "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. Id. *§ 12102(2)*(A).

The term "discriminate against a qualified individual on the basis of disability" includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee. 42 U.S.C. § 12112(b)(5)(A). The Supreme Court has also interpreted Title VII of the Civil Rights Act of 1964 ("Title VII"), which contains language similar to that in the ADA, to provide a cause of action for "harassment [which is] sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment… because it affects a term, condition, or privilege of employment." Patterson v. McLean Credit Union, 491 U.S. 164, 180 (1989).

Handicap discrimination is rarely "malicious." Instead, the courts have recognized that it is committed by "well-intentioned" but mistaken decision makers who rest their conclusions on inaccurate stereotypes and unsubstantiated assumptions. Handicap discrimination cases often arise from an "employer benevolently 'protecting' the employee from her own handicap. Handicap discrimination rarely results from a hostile purpose or intent to discriminate, and often occurs under the guise of extending a helping hand or a mistaken, restrictive belief as to the limitations of handicapped persons." Aero

Testing & Balancing Systems, Inc. v. The Human Rights Commission, 541 N.E.2d 1229, 1234-35 (Ill. App. 1989).

      a.   Plaintiff is Disabled as Defined by the ADA

As already stated, one of the definitions of "disability" under the ADA entails having a physical or mental impairment that "substantially limits" one or more major life activities of such individual. 42 U.S.C. § 12102(1). Prior to 2008, the Supreme Court had narrowly interpreted what constituted a disability under the ADA. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195-98 (2002); Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999). However in 2008, in response to these cases, Congress passed the ADA Amendments Act of 2008 ("ADAAA") in order to "reinstate a broad scope of protection" under the ADA and "reject" the narrow interpretations set forth in *Sutton* and *Toyota*.

Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis. *Id. § 1630.2(j)(1)(iii)*. The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.

      b.   Plaintiff is a "Qualified Individual" Under the ADA Because She Was Able to Perform the Essential Functions of Her Position.

The term "qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. § 1630.2(m).

Whether an individual is qualified under the ADA is a two-step analysis. Colón–Fontánez v. Municipality of San Juan, 660 F.3d 17, 32-33 (1st Cir. 2011). The employee bears the burden to show, first, that she possesses the requisite skill, experience, education, and other job-related requirements for the position, and second, that she is able to perform the position's essential functions with or without reasonable accommodation. Id. Defendant does not contest that Plaintiff meets the first test (skill, experience, education) of the "qualified individual" analysis. Defendant alleges, however, that Plaintiff is not a qualified individual under the ADA because she does not meet the second test (able to perform) of the "qualified individual" analysis due to her injuries.

Defendant argues that Plaintiff is not a qualified handicapped person because "she is unable to perform the essential functions of her job as a patrolman with or without an accommodation, and neither she nor any medical provider has predicted when or if Plaintiff will ever be able to perform these essential functions again." (Def. MSJ p. 4) See contra, Doane v. City of Omaha, 115 F.3d 624 (8th Cir. 1997) (where police department refused to rehire employee based on his monocular vision, the question was whether he could perform the essential functions of the job, and that question was for the jury); Clark v. City of Chicago, 2000 WL 875422 (N.D. Ill. 2000) (where Chicago Police Department refused to allow plaintiff to return to work because of a spinal condition, the City "refused to reinstate Clark because of his disability" and therefore the issue was whether or not he could perform the essential functions of the job).

Here however, throughout Plaintiff's treatment, her medical providers have stated that her injury is "temporary." In Dr. Winnick's June 15, 2012, IME report he explicitly

stated, "I do feel this disability is temporary in nature. I do not feel that Ms. Audette has reached maximum medical improvement (MMI) or a medical end result."

The Defendants' suggestion that the Plaintiff is not a qualified handicapped person because the timeframe in which she will return to work is "unknown" is belied by the facts. The departments own CBA states that the police officer "shall be granted leave without loss of pay for the period of such incapacity." There is no time limitation provided as to when the "period of incapacity" expires.

Additionally, Plaintiff has clearly indicated her desire to return to full work status. In her October 2013, request for a reasonable accommodation, Plaintiff stated, "…a seated position would allow me to feel productive as well as continue to heal and gain greater strength as I move towards returning to work full duty."

   c. Defendant's Failure to Engage in an "Interactive Process" Regarding Reasonable Accommodations Warrants Dismissal of Their Motion for Summary Judgment.

Despite the Defendants' contention, it is far from clear that they complied with their statutory duties in terms of affording the Plaintiff a reasonable accommodation. In general, an employee's initial request for an accommodation triggers an obligation on the part of the employer to engage in an "interactive process" to determine whether an appropriate accommodation is available. Russell, 437 Mass. at 443, 772 N.E.2d 1054. In some cases, a failure to engage in the interactive process may constitute a failure to provide a reasonable accommodation. Kvorjak v. Maine, 259 F.3d 48, 52-53 (1st Cir.2001); Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir.1996). That omission may, however, be harmless where it is clear that the employee cannot perform

the essential duties of the job under any circumstances. Kvorjak, 259 F.3d at 53; Soto-Ocasio v. Federal Express Corp., 150 F.3d 14, 19 (1st Cir.1998).

Here, the Defendants failed in their duty to engage in a dialogue with Officer Audette regarding possible accommodations, and failed to adequately investigate other means of accommodating her. *See* Bergman v. Town of Burlington Sch. Dep't, 18 Mass. Discrim. L. Rep. 143, (1996) ( MCAD found an employee was denied a reasonable accommodation where the employee with asthma asked for accommodation of ventilation by an open window and was denied). *See also* Woodson v. Town of Norton, 2002 WL 977223(MCAD)(determining Defendants failed in their duty to reasonably investigate a means to reasonably accommodate the handicap where the Defendants did not speak to the complainant or her coworkers about possible accommodations, but simply concluded that hiring an additional employee was the only possible accommodation for complainant's lifting restriction); *Malone v. Broadway Brake & Supply Co.,* 16 MDLR 1410 (1994)(holding "[t]he law requires that an employer's judgments about an employee's medical condition and ability to work should be based on a complete investigation including objective evidence and medical documentation").

Although the Plaintiff's disability was temporary, it is likely that a short-term accommodation might have been reasonable where a long-term one was not. In any event, the employer had a legal duty to consider and discuss possible alternatives, even if only to reject them as unreasonable. Here, it has been established that Defendant's Botieri and Rogers did not consider Plaintiff's suggested alternatives and made no effort to see if the reasonable accommodations were available. Defendant Chief Botieri testified to the following;

> Q: Did you ask anyone else if they had a need for assistance for a position that is strictly sedentary?
> A: No.
> Q: Did you talked to Lieutenant Higgins if he had any need for assistance with a strictly sedentary position.
> A: No.

Defendant Captain Rogers testified to the following;

> Q. But I am asking you, did you independently look into whether or not there were options available where Michelle Audette could be in a strictly sedentary position similar to that of NIBRS?
> A. Absolutely not.
> Q. Why not?
> A. It wasn't my responsibility. It was the responsibility of the Chief of Police.

Plaintiff specifically requested that she be allowed to work NIBRS in her October 9, 2013, letter to Defendant Botieri. Botieri refused to make any inquiry as to the plausibility of the accommodation. Defendant Botieri testified that at the time of Plaintiff's request they only had one person, Joan Lightbody, working on National Incident-Based Reporting System ("NIBRS") when typically they had more than one person working NIBRS. Defendant Botieri admits the he never even asked Joan Lightbody if, as of Plaintiff's request on October 9, 2013, there was any need for assistance working in NIBRS. PSOF, at ¶¶212-214.

Plaintiff's request for a sedentary "light duty" position was a legitimate request for a reasonable accommodation within the meaning of M.G.L. c. 151B. The Defendants' failure to engage in the interactive process in response to that request requires the denial of summary judgment as to the claim based on a temporary inability to perform essential functions of the job. Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 241 (D. Mass. 2008)

      d. <u>Defendant Would Not Have to Create a New Permanent Light Duty Position to Accommodate Plaintiff.</u>

Defendant argues that an employer's obligation to provide a reasonable accommodation does not require it to create a new position for an employee. However, Plaintiff has presented evidence that the Plymouth Police Department already offers a wide variety of existing light duty positions to patrolman, and the creation of a new permanent light duty position was unnecessary.

The Defendant drafted a letter in July of 2009 which outlined specific light duties including the following;

1. Assist Shift Commander and Dispatcher: call taking; records documentation, etc.
2. Assist Prosecuting Officer: preparing court folders, etc.
3. Assist Detective Division as practicable with paperwork
4. Assist Captain or Chief in Administrative Duties
5. Perform visual prisoner checks
6. Work at Station Officer's desk: assisting citizens

*(See* July 31, 2009, Town of Plymouth Police Department "Light Duties for Patrolmen, Exhibit 46)

Despite the Department's above stated light duty assignments, Defendant Botieri still maintained his wooden adherence to his belief that "the only light duty position available to the uniform division is the front desk (station officer)".

When asked if Defendant Botieri inquired about the above listed options, Botieri responded by stating;

> Q. What I'm wondering is if you asked anyone else or did any research or spoke with anybody else in the department about whether or not they need assistance from somebody who needed to stay sedentary?
> A. There's no need to.
> Q. Why not?
> A. I have seven unions. She can't do the work of all those other unions. She can't do clerical work. She can't do, you know, other

>       work. She can't do those things. Even if I did ask, just by the fact
>       that someone is saying, yeah, she can help me, that doesn't mean
>       that I'm able to assign her there. The only light duty assignment
>       for the uniform division is front desk.
>
> Q:    Did you inquire?
> A:    Why would I do that? No I didn't.

Defendant Botieri's response is alarming for several reasons. First and foremost, the fact that he never inquired about the availability for a sedentary position with anyone within the department is evidence of handicap discrimination. A simply inquiry to other members of the Department likely would have led to a light duty position where Plaintiff would have been able to remain sedentary while still performing the essential functions of her job with the reasonable accommodation.

Specifically, Plaintiff has alleged that Lt. Victor Higgins had stated that he needed assistance with strictly a sedentary position. Defendant Botieri stated that he never inquired with Lt Higgins, or anyone else, if they had any need for assistance for a position that is strictly sedentary.

Second, Defendant Botieri's lack of awareness or alleged misunderstanding of light duty assignments available to Plaintiff as outlined by the Departments own document, creates a question of fact as to whether there was discriminatory animus. The "light duty" list specifically states that patrolmen can work in other areas of "other unions" including the Chief's office, Captain's Office, Detective Division, Shift Commander and the Dispatchers.

### B. The Plaintiff Has Established A Claim of Gender Discrimination Against Defendants Pursuant to M.G.L. c. 151B.

Although Defendant claims that its treatment of Plaintiff including, but not limited to, discipline, ongoing harassment, disparate treatment and the subsequent

retaliation, were age and sex neutral, the record shows otherwise. At a minimum, the facts set forth above, as well as in Plaintiff's Response to Defendant's Statement of Fact, raise genuine issues of material facts as to whether those decisions were motivated by discriminatory animus.

Massachusetts law is designed to protect an individual from unlawful discrimination based upon her age and gender. See M.G.L. c. 151B, §4. To establish a prima facie case of age and gender discrimination, the plaintiff has to show that: (1) she was a member of a protected class; (2) she was subject to an adverse employment action; (3) that there was discriminatory animus; and (4) that the discriminatory animus caused the adverse employment action. Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001).

In the present case, Plaintiff has established a prima facie case of age and gender discrimination. First, Plaintiff falls within the protected group because she is a woman over the age of forty. Plaintiff has also demonstrated that she is qualified for the position.

Second, Plaintiff has shown that she was subject to an adverse employment action. Defendants place in dispute the second prong: that she suffered adverse employment actions of unequal treatment, threatening and harassing conduct by Defendants and subsequent retaliation based on her protected status.

There is no mechanical formula for determining pretext, thus, pretext may be proven in many ways. Kelley v. Corr. Med. Servs., 707 F.3d 108, 116 (1st Cir. 2013). One way to prove pretext is by presenting evidence of disparate treatment. Straughn v. Delta Air Lines, Inc. 250 F.3d 23, 43-44 (1st Cir. 2001); Mesnick v. General Electric Co., 950 F.2d 816, 824 (1st Cir. 1991). Another way is for the plaintiff to show that the employer gave "different and arguably inconsistent explanations" for taking the adverse

employment action. Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662-63 (1st Cir. 2010). When an employer, at different times, gives different and arguably inconsistent explanations for an adverse employment action, a jury may infer that the articulated reasons are pretexts for discrimination. Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000).

Plaintiff was subjected to obvious disparate treatment based upon her age and gender on numerous occasions discussed below.

> i. The Department Allowed Multiple Male Members of the Police Department Returning To Light Duty Status to Complete National Incident-Based Reporting System ("NIBRS") Data Entry and Denied Plaintiff This Same Opportunity.

In August 2012, Sergeant Christopher Butler returned from Injured on Duty ("IOD") status. From approximately August 2012 through November 2012, Sgt. Butler was tasked with assisting with The National Incident-Based Reporting System (NIBRS). NIBRS entry does not require any standing or walking.

Defendant Botieri stated that NIBRS is "time-consuming", "lot of work" and at certain points in time the Department was "several months behind" in logging the nearly 35,000 calls they receive. Defendant Botieri stated that with regard to NIBRS, "I believe there's always work to be done, because you could start those calls in that month and do the ones that you could." Botieri went even further to state, "I always feel like NIBRS is behind."

Chief Botieri described Sgt. Butler's light duty status as an "assignment of opportunity." The obvious issue with this "assignment of opportunity" is the timing in relation to the denial of Plaintiff's request for a reasonable accommodation. From

approximately August 2012 to November 2012, Sergeant Butler was tasked with assisting with NIBRS compliance during his shift.

Prior to, and during this time frame, Plaintiff had repeatedly asked for a sedentary position. Defendant Botieri denies ever hearing Plaintiff ask for a sedentary position. Defendant Botieri stated, "But that's not Michelle asking for a sedentary position. That's her doctor saying that she can only do a sedentary position, and I don't have one (sedentary position.)"

Plaintiff can also establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a fact finder could "infer that the employer did not act for the asserted non-discriminatory reasons." Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir.1998). Clearly, based upon the fact that Sgt. Butler was performing NIBRS during this time period, there was a sedentary position available which Plaintiff could have performed.

Defendant contends that one of the reasons for not allowing Plaintiff to perform the NIBRS data entry was, "… to create another assignment for a patrolman on light duty, the Department would be required to bring in an off-duty patrolman and pay him or her overtime wages to fill the shift officer assignment for every shift that the light duty patrolman works or risk falling below the Department's minimum staffing level." The Defendant claims that this financial hardship was not imposed on the Department when Sgt. Butler was allowed to work NIBRS based upon the discrepancies in language between the differing union contracts.

The defendant relies on the alleged "financial hardship" that would be caused by placing Plaintiff in a light duty position other than station officer creating a need to bring in an additional office to maintain the minimum staffing requirements.

The Defendants' "financial hardship" argument is fatally flawed.

On May 30, 2013, Officer Benjamin Dexter was placed on full-time light duty. He is thirty-one years old. Officer Dexter is a member of the same union as the Plaintiff. Chief Botieri assigned Officer Dexter to train with Detective Morse and assist with NIBRS data entry while on light duty. A closer reading of the Department's May 30, 2013, Personnel order states, "For staffing purposes, Officer Dexter's position <u>will not</u> be included in the minimum staffing level." Id. Essentially, the order arbitrarily removes Officer Dexter from consideration in the Department's minimum staffing level, while the Defendant simultaneously attempts to use the "financial hardship" excuse to deny the Plaintiff's assignment to NIBRS as her light duty position.

In a similar "personnel order" issued by Capt. Rogers regarding Plaintiff's light duty assignment, the order states "For staffing purposes, Officer Audette's position <u>will</u> be included in the minimum staffing level." PSOF, at ¶160.

This blatant discrepancy in the manner in which Plaintiff's younger male counterpart was treated is undeniable. The timing and temporal proximity of the NIBRS appointment for Officer Dexter also raises a question of fact as the legitimacy of the Department's actions.

On April 30, 2013, Plaintiff informed the Department, specifically Defendant Botieri, that she was undergoing surgery in early June. Subsequently, on May 30, 2013,

two weeks before Plaintiff's surgery, Defendant Botieri allowed Officer Dexter to perform NIBRS data entry, a sedentary light duty position.

On or about early September 2013, Plaintiff notified the Department that she would be returning to work on October 21, 2013. On October 6, 2013, less than two weeks before Plaintiff's return, the Botieri determines that the Department "had sufficiently caught up on its NIBRS data inputting" and Officer Dexter was reassigned to the station officer assignment for the remainder of his time on light duty. PSOF, at ¶210.

For the exact same five-month time period that Plaintiff was recovering from surgery, Defendant Botieri determined the Department needed to have additional NIBRS data entry. He also determined that Officer Dexter's position would not be included in the minimum staffing level. However, immediately upon learning that Plaintiff was returning, and despite his testimony that "there's always work to be done" and Botieri "always feel like NIBRS is behind," he removed Dexter from NIBRS.

Defendant also contends that Dexter was brought in on May 30 to help with NIBRS because of the "urgent need for assistance with NIBRS compliance."  However, this argument is similarly flawed. Defendant Rogers provided conflicting testimony that it was, in fact, "February or March" that was the "critical" time for NIBRS due to the necessity to have the data inputted by the end of the calendar year. SOF, at ¶88.

Also notable is the fact that the personnel order regarding Plaintiff's return to light duty assignment after her surgery stated "For staffing purposes, Officer Audette's position <u>will</u> be included in the minimum staffing level."

On October 9, 2013, Plaintiff sent Defendant Botieri a letter titled "Reasonable Accommodation." In said letter, Plaintiff stated the following:

> "I am requesting a "Reasonable Accommodation" as I would like to return to work and feel that I can be a productive member of this Police Department…I recently became aware that a non traditional "Light Duty" assignment had been offered to another Officer and that this assignment is currently vacant. This assignment was utilized to aid in keeping the NBIRS records/stats up to date. This assignment is mainly sitting while reading and completing data on a computer. I am hopeful that this same opportunity could be extended to me. Being assigned to a seated position would allow me to feel productive as well as continue to heal and gain greater strength as I move towards returning to work full duty."

On October 18, 2013, Defendant Botieri responded and summarily denied Plaintiff's request. Defendant Botieri testified that at the time of Plaintiff's October request, one person, Joan Lightbody, was working on NIBRS, although typically the Department had more than one person. Defendant Botieri never asked Joan Lightbody if, at that time, there was any need for assistance working in NIBRS. PSOF, at ¶¶212-214.

### ii. Similarly Situated Males Were Treated Differently Than Plaintiff.

The most probative means of establishing that the plaintiff's termination was a pretext for discrimination is to demonstrate that similarly situated employees were treated differently. Smith College v. Massachusetts Comm'n Against Discrimination, 376 Mass. 221, 228, 380 N.E.2d 121 (1978) (fact of discriminatory motive "can be inferred from differences in the treatment of [employees of different races]"). The Plaintiff must identify other employees to whom he is similarly situated "in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations." Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir.1994), cert. denied, 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995), quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992). Although the offenses of two employees need not be identical, the offenses must be of comparable seriousness. McDonnell Douglas Corp., supra at 804, 93 S.Ct. at 1825.

Defendant makes no reference whatsoever in their Summary Judgment motion to the discipline imposed on Plaintiff by Botieri. Plaintiff returned to work on April 8, 2012. There was no discussion of any potential discipline for her involvement with the Officer JS incident. Defendant Botieri offered no explanation why he didn't provide Plaintiff with notice of potential discipline or a copy of the complaint against her until after she complained about reasonable accommodations to HR. PSOF, at ¶159.

Defendant Rogers testified that Officer Reid, just like the allegations against Plaintiff, "hampered with the investigation" of Officer JS. PSOF, at ¶170. Officer Reid, not Plaintiff, actually transported Officer JS out of the state.

The Chief's primary concern was that Officer Sullivan had been transported out of town, and not that Plaintiff or Reid allegedly failed to notify the department of their whereabouts. PSOF, at ¶126. Officer Reid never informed the Department at any point that he had been at Officer JS' house. Plaintiff informed Lt. Flynn immediately upon returning to the station of her recent interaction with Officer JS. Id. at ¶172.

However, Officer Reid, Plaintiff's male counterpart, despite being more involved than Plaintiff in providing assistance and actually physically transporting "Officer JS" to the treatment facility in Brattleboro, Vermont, was never disciplined for his actions nor did he receive any letter of discipline.

Plaintiff was charged with violation of "Conduct Unbecoming an Officer" and "Neglect of Duty." Rule 4.1 "Conduct Unbecoming an Officer" states "Officers shall not commit any specific act or acts of immoral, improper, unlawful, disorderly or temperate conduct <u>whether on or off duty</u>…" (emphasis added). PSOF, at ¶172.

Defendant Rogers testified that "Officer Reid was not subjected to discipline

because he was off duty that day." PSOF, at ¶166. However, his logic is defective based upon the fact that the "Conduct Unbecoming Charge" brought against Plaintiff, for the same actions as Reid, has no requirement that the officer must be on duty to be subjected to the discipline.

Defendant Rogers also testified that Officer Reid was not disciplined because he was "working as a union representative."

Once again, Rogers' rationale fails. Rogers previously testified that he believes Plaintiff was acting as a union official with regard to her interactions with Officer JS on November 25, 2011. In Plaintiff's report regarding her interactions with Officer JS on November 25 she clearly states, "My (Plaintiff) contact with Ofc. JS on this date was at his request and solely in the capacity of a union official." PSOF, at ¶¶135-237.

Furthermore, two other male officers who were found to have violated Department policy and procedure on November 25, 2011, were also not disciplined.

Officer McPeck and Officer Higgins were the first officers to arrive to the scene of the alleged incident. According to Captain Rogers, both (male) officers failed to comply with Department policy regarding notifying dispatch on a recorded line of the altercation. Instead they contacted their superiors with their personal cell phones. PSOF, at ¶¶116-118.

Captain Rogers stated that when he inquired with the two male officers about their policy violation they stated the reason they did not call dispatch was because "it was one of their fellow officers that was involved in the altercation."

Even though both officers failed to appropriately notify dispatch of an incident, similar to the charges brought against Audette, neither Officer McPeck nor Officer

Higgins, both male officers, were disciplined for their actions that same night.

### iii. Plaintiff was Disciplined Differently Than Male Counterparts for the Identical Alleged Infraction.

The following is a series of events that nearly mirror each other in every aspect, except for the ultimate outcome as to how the officers involved were disciplined;

On or about April of 2015, male police officer, Jamie LeBretton was contacted by a fellow officer, "Officer K", who reported that he was drinking heavily and was depressed. PSOF, at ¶¶223-227. Similarly, on November 25, 2011, Officer Audette, a female, was contacted by a fellow officer, who reported that "Officer JS" needed assistance.

Officer Jamie LeBretton, a union official (President), went to Officer K's house while on duty. Officer Audette, a union official, went to Officer JS' house while on duty.

Officer LeBretton did not communicate to dispatch through MDT or radio that he was going to Officer K's house. Officer Audette informed dispatch that she would be "tied up for a few" but did not specifically state she was going to Officer JS's house.

Officer LeBretton arranged for Officer K to be transported to a rehabilitation center in Brattleboro Vermont. Officer Audette arranged for Officer K to be transported to a rehabilitation center in Brattleboro Vermont.

Upon arriving back at the station Officer LeBretton informed Lt. Reimer what had transpired. Upon arriving back at the station Officer Audette informed Lt. Flynn what had transpired.

Officer LeBretton was not investigated or asked to write a report regarding the incident. Officer Audette was investigated and asked to write multiple reports regarding the incident.

Officer LeBretton was not disciplined for his actions. He did not receive a letter of reprimand. Id. Officer Audette was disciplined and charged with Conduct Unbecoming an Officer and Neglect of Duty.

Plaintiff has produced abundant evidence for a jury to find that as a result of the combined retaliatory and discriminatory conduct of defendants, including the pervasive and overt disparate treatment compared to her younger male coworkers, her working conditions were changed so as to create a material disadvantage in her employment.

## CONCLUSION

For the reasons set forth herein, the Plaintiff submits that the Defendants' Motion for Summary Judgment should be denied.

> Respectfully submitted,
> For the Plaintiff,
> By Her Attorney,
>
> /s/ Timothy M. Burke
> Timothy M. Burke, Esquire
> BBO #065720
> LAW OFFICES OF TIMOTHY M. BURKE
> 160 Gould Street, Suite 100
> Needham, MA  02494
> (781) 455-0707

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 30, 2015

/s/ Timothy M. Burke