# United States Court of Appeals
## For the First Circuit

No. 15-2457

MICHELLE AUDETTE,

Plaintiff, Appellant,

v.

TOWN OF PLYMOUTH, MA; PLYMOUTH POLICE DEPARTMENT;
CHIEF MICHAEL E. BOTIERI, in his official and individual
capacity; CAPTAIN JOHN ROGERS, in his official and individual
capacity; ROBERTA KETY, in her official and individual capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Timothy M. Burke, with whom Jared S. Burke and Law Offices of
Timothy M. Burke, were on brief for appellant.
Evan C. Ouellette, with whom Leonard H. Kesten, Deidre Brennan
Regan, and Brody, Hardoon, Perkins & Kesten, LLP, were on brief
for appellee.

May 26, 2017

      **LIPEZ**, <u>**Circuit Judge**</u>.  Appellant Michelle Audette, a
police patrol officer[1] in Plymouth, Massachusetts, appeals from
the entry of summary judgment for the Town of Plymouth ("Town"),
the Plymouth Police Department ("Department"), and a number of the
Town's and the Department's employees.  Audette claims that she
suffered discrimination in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and its
Massachusetts state-law corollary, Massachusetts General Laws
chapter 151B § 4, when the defendants failed to accommodate her
request for transfer to another position in the Department after
she sustained an on-the-job injury.  Audette further alleges that
she suffered illegal retaliation when she attempted to assert her
rights under the ADA and that she suffered discrimination on the
basis of her gender in violation of Massachusetts law.  We affirm
the district court's rejection of these claims.

I.

      The following facts are undisputed, except as noted.

**A. Audette's Ankle Injuries**

      Audette began her career as a patrol officer for the
Plymouth Police Department in 1986.  While working on October 4,
2010, she sustained the first of two on-the-job injuries to her

---

[1] The Plymouth Police Department's official title for the
position is "patrolman," but we opt to use the gender-neutral term
"patrol officer" throughout this opinion.

right ankle. These injuries led to visits to many doctors, two surgeries, and rounds of physical therapy. To this day, she has yet to fully recover.

Audette's doctors have prescribed physical limitations to her movement in order to aid in her recovery. These limitations have varied at times, but include: strictly sedentary work, shorter working shifts (four or six hours, rather than the typical eight-and-a-half), working in an "air-cast" boot, working with the use of crutches, limited standing or walking to forty-five minutes out of every hour, and limited bending. According to the Plymouth Police Department's "Rules and Regulations" manual, a patrol officer's duties include patrolling by foot and in a vehicle, responding to emergencies, providing services on an emergency basis, aiding individuals who are in danger of physical harm, preserving crime scenes, and apprehending criminal offenders. Since the initial injury, Audette's limitations have prevented her from fulfilling her standard responsibilities as an active patrol officer, except for a brief period between August 2011 and January 2012, when she sustained a second on-the-job injury to the same ankle.

Nevertheless, the Plymouth Police Department continues to employ Audette as a patrol officer. When doctors' limitations on her working conditions have permitted, Audette has received full-time pay for working part-time shifts in a light-duty capacity

as a station officer.[2]  When her doctors' limitations have not allowed her to work as a station officer, Audette has been afforded full pay while taking "injured on duty" ("IOD") leave.[3]  The Department has also granted her other accommodations not available to other patrol officers, including an elevator key and a designated, convenient parking spot.

**B. The Department's National Incident-Based Reporting System**

Like many police departments across the nation, the Plymouth Police Department participates in the National Incident-Based Reporting System ("NIBRS").  NIBRS is an incident-based reporting system used by law enforcement agencies to collect and report data on crimes.  Local, state, and federal agencies compile and maintain data in NIBRS as part of their records management responsibilities.  Ordinarily, two Department employees are

---

[2] The Department's station officer works behind the front desk at the Plymouth police station and can be assigned various tasks such as assisting civilians who come to the station to file complaints, filling out various forms, assisting with booking procedures and fingerprinting, assisting dispatch when necessary, coordinating overtime assignments for other officers, and conducting prisoner cell checks at the station.

[3] For example, Audette was briefly placed on paid IOD leave after her first ankle injury when her doctor limited her to strictly sedentary work, because the station officer position -- though a light-duty position involving limited movement -- requires some amount of standing and walking.  Audette was also placed on paid IOD leave for one week when one of her doctors required her to use crutches, due to the Department's policy of prohibiting on-duty officers' use of crutches.

responsible for NIBRS data: the Department's Records Sergeant,[4] who oversees all records maintenance, including NIBRS, and a civilian clerical worker.  In July 2012, the Records Sergeant was also assisted by Detective Robert Morse, who oversaw the Department's evidence management responsibilities.  After the Records Sergeant announced his retirement in September 2012, Morse temporarily took over NIBRS oversight responsibilities.

In May 2013 -- when Audette was out of work due to her first ankle surgery -- Morse announced that he would retire.  On May 30, 2013, patrol officer Benjamin Dexter returned to work after sustaining an injury, and he was placed on full-time light duty.  Plymouth Police Chief Michael Botieri assigned Dexter to train with Morse and assist in getting "caught up" with the NIBRS records.  By October 6, the Department had sufficiently caught up with its backlog, and Dexter was reassigned as a station officer for the remainder of his light-duty status.  The Department never appointed another patrol officer on light duty to assist with the NIBRS data outside of Dexter's four-month assignment in 2013.[5]  In

---

[4] The Records Sergeant's duties also include managing the Department's Records Division, maintaining and processing Department records, ensuring compliance with public records laws, supervising clerical staff, and responding to public records requests.

[5] There was one other occasion on record in which an officer -- though a sergeant and not a patrol officer -- was assigned to assist with NIBRS maintenance.  During the summer of 2012, Sergeant Christopher Butler suffered an injury and was placed on light duty.  The only light-duty position within the Department

November 2013, Dexter returned to active-duty status as a patrol officer, and Sergeant Michael Ferazzi was appointed as the new Records Sergeant and became responsible for NIBRS oversight.

## C. Audette's Accommodation Request

Audette underwent ankle surgery in June 2013.  Later that summer her doctor issued a note stating that she could return to work on October 21.  The only limitation the doctor placed on Audette was "walking/standing based on symptoms."  On October 9 -- three days after Officer Dexter had been reassigned from NIBRS data maintenance to station officer -- Audette delivered a letter to Chief Botieri titled "Reasonable [Accommodation]," which requested that she be allowed to work the NIBRS data-entry position to which Dexter had been assigned.  We quote the letter in full:

> I am requesting a "Reasonable [Accommodation]" as I would like to return to work and feel that I can be a productive member of this Police Department.
>
> Following a very extensive and [painful] ankle injury I am currently in the healing process after receiving [surgery].  I have recently received a [Doctor's] note allowing for me to return to work on October 21, 2013.  The physical limitations are for 4 hours, with walking and standing limited to symptoms.  As I continue with my Physical Therapy I find that my symptoms vary day to day.

available for sergeants is "Shift Commander." Because another employee was already assigned to work as a shift commander -- and to avoid having two employees assigned to the same task -- Sergeant Butler was instead assigned to assist in updating the Department's NIBRS logs.  Sergeant Butler was removed from light duty and returned to his active duty position by November of 2012.

> I recently became aware that a nontraditional
> "Light Duty" assignment had been offered to
> another Officer and that this assignment is
> currently vacant. This assignment was
> utilized to aid in keeping the [NIBRS]
> records/stats up to date. This assignment
> is mainly sitting while reading and completing
> data on a computer.
>
> I am [hopeful] this same opportunity could be
> extended to me. Being assigned to a seated
> position would allow me to feel productive as
> well as continue to heal and gain greater
> strength as I move towards returning to work
> full duty.

Chief Botieri met with Audette and told her that the non-traditional data-entry assignment to which her letter referred had been completed and that the only light-duty assignment available for patrol officers was the station officer position that she had intermittently worked before her surgery. He sent an email to Audette on October 18 confirming this information, which also stated that "[i]f an assignment does become available and the work is within your limitations[,] I will notify you."

Despite not receiving the accommodation she requested, Audette returned to work as scheduled on October 21, 2013, and she continued to work as a station officer until September 2014, when she took time off for her second ankle surgery. After the second surgery, Audette again returned to work as a station officer in April 2015 under her doctor's order that she work in a light-duty capacity for four hours per day with "limited bending," and she

has continued to work in that position.  At no point has Audette been assigned responsibilities that conflict with any doctor's orders.  Nor has she ever indicated to Chief Botieri or anyone else in the Department that she is unable to perform her assigned duties

## D. Audette's Disciplinary Proceedings

At an early stage during Audette's medical ordeal, some events occurred that underlie her retaliation and gender discrimination claims.  On the evening of November 24, 2011, one of Audette's fellow officers got into an off-duty altercation at a bar in downtown Plymouth.  As a result, the patrol officer contacted Audette, as his union vice-president, and officer Ray Reid, his union steward, seeking assistance in getting placed into an alcohol treatment facility for police officers in Brattleboro, Vermont.  The following day -- when Reid was off-duty but Audette was on-duty -- they went to the patrol officer's house for about an hour-and-a-half.  After meeting with the patrol officer, Reid agreed to transport him to the alcohol treatment facility, and Audette told Reid that she would inform the Department about what had occurred and that the patrol officer would be out sick while at the treatment facility.  When Audette left her patrol to attend to her colleague at his home around 10:00 a.m. that morning, she notified a dispatcher that she would be "tied up" for a while. Audette left her coworker's home at 11:30 a.m. but did not inform

anyone in the Department about what had occurred there, or that the coworker was on his way to the Vermont facility, until sometime between 1:49 - 3:00 p.m. that afternoon.

On April 17, 2012, Audette met with the Town's Human Resources Director, Roberta Kety, to discuss Audette's return to work at the Department after sustaining her second ankle injury. Audette alleges that as a result of this meeting, Kety informed Chief Botieri that Audette had complained about how she had been treated by the Department and that she had asked for a reasonable accommodation, including, but not limited to, a sedentary light-duty position. Three days after meeting with Kety, Audette met with Chief Botieri, and he broached the topic of Audette's early retirement.[6]

A few days after their initial meeting, Audette again met with Chief Botieri, who stated that there was an "open discipline issue" regarding her handling of the incident at her fellow patrol officer's home, though Chief Botieri chose not to resolve the issue at that time. At some point during the next two weeks, Audette was given the option of taking a suspension or receiving a letter of reprimand as a result of the disciplinary

---

[6] Appellees deny both that Audette asked for an accommodation in the meeting with Kety and that Chief Botieri suggested to Audette that she retire.

incident.[7]  On May 2, 2012, Chief Botieri issued a letter of reprimand to Audette that stated she had violated multiple rules of professional conduct, including engaging in "conduct unbecoming of an officer" and "neglect of duty."  The letter stated that it would be subject to review and removal from her personnel file within one year if she was involved in no other disciplinary incidents during that period.

Rather than signing the letter of reprimand, Audette opted for a disciplinary hearing.  After the disciplinary hearing, there was a finding that Audette had violated the Department's rules and regulations, and she received a new letter of reprimand on May 23.  The second letter was identical to the first, except that it stated it would remain in Audette's personnel file for up to two years, rather than one.  The letter of reprimand was the only disciplinary action taken against Audette for the incident, and it did not affect her rank, pay, or duties as a patrol officer.

Audette filed a demand for arbitration challenging the reprimand letter.  In December 2013 the police officers' union -- on Audette's behalf -- entered into a settlement agreement with the Town of Plymouth and Chief Botieri.  The settlement agreement stated that the Town would "not rely on the reprimand for any

_____

[7] Chief Botieri asserts that suspension was never on the table as a disciplinary option, but Captain John Rogers stated in his deposition that he believed Audette was given a choice between suspension and a letter of reprimand.

future employment related purpose," that the Town would remove the letter from Audette's file, that the settlement agreement did not constitute an admission of any party, and that the "execution of [the] agreement shall constitute a waiver of any action arising under either contract or statute with regard to the issuance of the reprimand."    Because the letter had not been removed immediately from Audette's personnel file, despite the settlement agreement, Chief Botieri sent a letter to the Town's Human Resources Department on May 29, 2014, notifying it that the letter should have been removed, and he instructed the department to do so.

**E. Procedural History**

In August 2014, Audette filed a complaint in Massachusetts state court alleging a failure to accommodate under the ADA and the Rehabilitation Act (Counts I and II); discrimination based on an "actual handicap," a "perceived handicap," and a "record of handicap" under Massachusetts law (Counts III, IV, and V); gender and age discrimination under Massachusetts law (Counts VI, VII, VIII, and IX); intentional infliction of emotional distress (Count X); and conspiracy (Count XI).    Defendants removed the action to federal court and filed a motion for summary judgment in September 2015.

After a hearing, the district court granted summary judgment for the defendants, stating that Audette had "failed to

raise a genuine issue of material fact as to her being a qualified disabled individual, able to perform the essential functions of a patrol officer, so her disability discrimination claims must fail." It also found that she failed to raise "genuine and material issues of fact" regarding her other discrimination claims, noting that she had "not submitted admissible evidence sufficient for a jury to infer that she has suffered an adverse employment action because of either [her age or gender]." Finally, it concluded that she failed to establish a prima facie case for all of her remaining claims. Audette timely appealed.

## II.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). "Material facts" are those which "might affect the outcome of the suit under the governing law," and an issue is "genuine" if there is evidence that would allow a reasonable jury to find for the non-moving party. Id. (quoting Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 218-219 (1st Cir. 2004)).

Although we construe the factual record in the light most favorable to the non-moving party -- here, Audette -- we need

not consider "conclusory allegations, improbable inferences, [or] unsupported speculation." Id. (quoting Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002)).  We review the district court's grant of summary judgment de novo, id., and "[w]e may affirm summary judgment 'on any basis apparent in the record,'" Jones v. Nationwide Life Ins., 696 F.3d 78, 86 (1st Cir. 2012) (quoting Chiang v. Verizon New Eng. Inc., 595 F.3d 26, 34 (1st Cir. 2010)).

### III.

### A. Disability and Handicap Discrimination Claims

The ADA prohibits employers from discriminating against a "qualified individual" -- defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" -- on the basis of disability.[8]  42 U.S.C. §§ 12111(8), 12112(a); Lang v. Wal-Mart Stores East, L.P., 813 F.3d 447, 454 (1st Cir. 2016).  Failing to provide reasonable accommodations for a qualified employee's known physical or mental limitations constitutes discrimination, unless an employer can demonstrate

---

[8] We have noted in the past that Massachusetts's handicap discrimination statute, Massachusetts General Laws chapter 151B, §4, is "nearly identical" to the ADA.  Mulloy, 460 F.3d at 154 (1st Cir. 2006).   Other than a "gloss" that the Massachusetts workers' compensation statute potentially places on Massachusetts General Laws chapter 151B § 4, which is not at issue in this case, we analyze the statute in exactly the same manner as the ADA.  Id. at 154-55.

that such an accommodation would impose an undue hardship.[9]  Lang,
813 F.3d at 454; 42 U.S.C. § 12112(b)(5)(A).

        To prevail at the summary judgment stage on a typical
claim of failure to accommodate, a plaintiff must present
sufficient evidence indicating "that (a) she is disabled within
the ADA's definition; that (b) she could perform the job's
essential functions either with or without a reasonable
accommodation; and that (c) the employer knew of her disability,
yet failed to reasonably accommodate it."  Lang, 813 F.3d at 454.

        However, the burden for the employee at the second step
of the inquiry changes slightly when an employee becomes disabled,
can no longer perform the essential functions of her job, and
requests as an accommodation a transfer or complete reassignment
of duties.  Instead of addressing the essential functions of her
current position, an employee must demonstrate that she can perform
the essential functions of the position she desires.[10]  Moreover,

---

[9] We have noted that in a reasonable accommodation case, the
burden is first on the employee to demonstrate that a proposed
accommodation would enable her to perform the essential functions
of her job and that the proposed accommodation, on the face of
things, appears feasible for the employer.  See Reed v. LePage
Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001).  If the
plaintiff carries this initial burden, the employer has the
opportunity to demonstrate that the actual costs of the facially
feasible accommodation in fact create an undue hardship.  Id.  The
Supreme Court approvingly cited Reed's framework in U.S. Airways,
Inc. v. Barnett, 535 U.S. 391, 401-02 (2002).

[10] Because the ADA definition of "qualified individual"
includes the ability to perform the essential functions of the job
that the individual "holds or desires," a disabled employee seeking

the employee must demonstrate that there is an actual vacant position to which she can transfer.  Lang, 813 F.3d at 456.  "An employer is not required by the ADA to create a new job for an employee, nor to re-establish a position that no longer exists."  Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001); see also Lang, 813 F.3d at 456.

---

a transfer is a "qualified individual," so long as she can perform the essential functions of the vacant position -- with or without a reasonable accommodation -- even if she can no longer perform the essential functions of her current position.  Indeed, "reassignment to a vacant position" is explicitly listed among the reasonable accommodations offered by the ADA.  42 U.S.C. § 12111(9)(B); Barnett, 535 U.S. at 397.  This understanding of a "qualified individual" accords with one of the purposes of the ADA -- accommodating disabled employees who can no longer perform the essential functions of their current job, with or without a reasonable accommodation, by allowing them to transfer to a vacant position whose essential functions they can perform.  See H.R. Rep. No. 101-485, pt. 2, at 63 (1990) ("If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker."); see also 29 C.F.R. pt. 1630 App. § 1630.2(o); S. Rep. No. 101-116, 101 Cong., 129-30 (1989); Stacy M. Hickox, Transfer as an Accommodation: Standards from Discrimination Cases and Theory, 62 Ark. L. Rev. 195, 196-201 (2009).  Indeed, a number of our sister circuits have held that the ADA requires such an interpretation.  See, e.g., Cravens v. Blue Cross & Blue Shield of Kan. City, 214 F.3d 1011, 1016-18 (8th Cir. 2000) (holding that the ADA requires an employer to consider reassigning an individual with disabilities where the individual can no longer perform the essential functions of her current position); Burns v. Coca-Cola Enters., 222 F.3d 247, 256 (6th Cir. 2000) (same); Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1162 (10th Cir. 1999) (same); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1301 (D.C. Cir. 1998) (same); Gile v. United Airlines, Inc., 95 F.3d 492, 498 (7th Cir. 1996) (same).

The parties agree that Audette has presented evidence that she is disabled within the ADA definition, and there is no dispute that Audette is unable to fulfill the duties and responsibilities of an active patrol officer.[11] But Audette argues that the ADA entitles her to transfer to a clerical position maintaining NIBRS data.

In an attempt to prove that such a vacancy existed, Audette cites Chief Botieri's testimony that NIBRS data maintenance is a "lot of work," "takes a lot of time," and that at certain points the Department was "several months behind" in logging all of its data. This testimony demonstrates only that the Department had fallen behind on its record-keeping obligations and that additional help was occasionally used to ease the Department's backlog. It does nothing to establish that the Department had a <u>vacancy</u> that Audette could have filled.

She next argues unpersuasively that the "time frames" clearly demonstrate that there was a vacant NIBRS data-entry position available. Although the Department temporarily assigned an injured patrol officer, Officer Dexter, to assist with NIBRS data entry during the summer that Audette underwent her first ankle

---

[11] Each of Audette's many physicians has consistently stated that she is unable to perform tasks beyond the light-duty station officer assignment, and none of them have been able to predict when she might recover to a point in which she could return to her active patrol officer duties, with or without a reasonable accommodation.

surgery, the Department determined that it had sufficiently "caught up" on the project by early fall, reassigning Dexter to work as a station officer on October 6. Audette did not request a transfer to the position until three days after the Department eliminated the temporary position, and no patrol officer has subsequently been assigned to such a position.

In a final attempt to prove that a vacancy existed, Audette points to the Department's hiring of a new Records Sergeant -- a position that was vacant at the time of her accommodation request -- one month after her request for a data-entry position was denied. As we noted, supra, the Department tasks two people with working on NIBRS data maintenance -- a civilian clerical worker and the Department's Records Sergeant. But the Records Sergeant's duties are much broader than the exclusive data-entry tasks that Audette requested to perform. The Records Sergeant oversees all Department records (not merely NIBRS), supervises civilian clerical staff, and responds to public records requests. Audette cannot persuasively argue that that the appointment of a new Records Sergeant, with the broad responsibilities of this position, constitutes evidence that the Department failed to consider her for a vacant NIBRS data-entry position.[12] Since Dexter's transition out of the data-entry

---

[12] Audette, a patrol officer, specifically requested a seated data-entry position and did not request to be promoted to Records

position on October 6, 2013, no one other than the Records Sergeant and the civilian clerical worker has been assigned to work on the NIBRS log.

In short, Audette has "offered no evidence that there were any [NIBRS data-entry] vacancies when she asked for an accommodation, and it was her burden to show as much." Lang, 813 F.3d at 456. Thus, the district court correctly entered summary judgment on her ADA and Massachusetts General Laws chapter 151B, § 4 handicap discrimination claims.

## B. Retaliation Claim

Audette's initial complaint did not outline a claim for ADA retaliation. Her only claim filed under the ADA, Count I, cites the entire statute and states that defendants "failed to reasonably accommodate Plaintiff's disability, failed to engage in an interactive process to properly and reasonably address her serious health concerns, and as a result she was subject to adverse employment actions by means of Defendants['] discriminatory

---

Sergeant. Some of our sister circuits have held that the ADA does not require an employer to promote a disabled employee as a reasonable accommodation. See, e.g., McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 98 & n.4 (2d Cir. 2009); see also 29 C.F.R. pt. 1630, App. § 1630.2(o) ("[A]n employer is not required to promote an individual with a disability as an accommodation."). We have not faced this question ourselves, and need not comment upon it here, except to note that even if Audette's request could have been construed as a request to be promoted to Records Sergeant, she has proffered no evidence to demonstrate that she was qualified for the position.

- 18 -

conduct and <u>other retaliatory and unfair treatment</u>." (emphasis added).  Appellees argue that this reference to "other retaliatory and unfair treatment" is not substantial enough to constitute a claim of ADA retaliation.

We need not decide whether Audette's passing reference to "retaliatory and unfair treatment," buried within the complaint's failure-to-accommodate claim, constitutes an independent cause of action that she could have pursued as a companion to her principal ADA claim.  In her memoranda filed in opposition to summary judgment, Audette addressed no ADA retaliation claims.  The only accusations of retaliation she argued on summary judgment were in reference to her gender discrimination claim and an intentional infliction of emotional distress claim that is not before us on appeal.  Even if we were able to glean an ADA retaliation claim from Audette's complaint, she certainly waived such a claim during the summary judgment proceedings.  <u>See</u> <u>Schneider</u> v. <u>Local 103 I.B.E.W. Health Plan</u>, 442 F.3d 1, 3 (1st Cir. 2006) (per curiam) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived." (quoting <u>Grenier</u> v. <u>Cyanamid Plastics, Inc.</u>, 70 F.3d 667, 678 (1st Cir. 1995))).

**C. Gender Discrimination Claim**

When examining an employment discrimination claim under Massachusetts General Laws chapter 151B, the Supreme Judicial

Court of Massachusetts uses the familiar McDonnell Douglas burden
shifting analysis.  Sensing v. Outback Steakhouse of Fla., LLC,
575 F.3d 145, 154 (1st Cir. 2009); see also McDonnell Douglas Corp.
v. Green, 411 U.S. 792, 802-04 (1973).  Under this analysis, a
plaintiff must first present a prima facie case of employment
discrimination.  If she succeeds, the burden shifts to the
defendant to present evidence of a legitimate, non-discriminatory
reason for the employment action taken against the plaintiff.
Goncalves v. Plymouth Cty. Sheriff's Dep't, 659 F.3d 101, 105 (1st
Cir. 2011).  If the defendant provides such a reason, the burden
shifts back to the plaintiff to prove by a preponderance of the
evidence that the defendant's purported reason was merely
pretextual.  Id.

        We begin and end with Audette's prima facie case for
gender discrimination.  To establish a prima facie case in this
context, Audette must provide evidence that (1) she is a member of
a protected class, (2) she suffered from an adverse employment
action, (3) discriminatory animus, and (4) a causal linkage between
the discriminatory animus and the adverse employment action.
Lipchitz v. Raytheon Co., 751 N.E.2d 360, 368 (Mass. 2001); cf.
Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015) (employees
claiming denial of promotion on basis of gender must demonstrate
that they are (1) a member of a protected class, (2) qualified for
the position sought, (3) suffered an adverse employment action,

and (4) the position remained open or was filled by a person with similar qualifications).  The district court found that Audette failed to provide "any admissible evidence sufficient for a jury to infer that she has suffered an adverse employment action because of either her [gender or age]."[13]  We agree.

Citing our decision in Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011), the district court indicated that Audette had suffered no adverse employment action because she could point to no "tangible consequences" of Chief Botieri's reprimand letter.  Appellees, unsurprisingly, agree with the district court's assessment and note that the letter issued to Audette did not affect her salary, grade, or any other objective terms of her employment or working conditions.  Conversely, Audette argues that a formal letter of reprimand subjecting her to a period of enhanced discipline and charging her with engaging in "conduct unbecoming an officer" and "neglect of duty" constitutes serious reputational harm that rises to a "tangible consequence."

If Audette's story concluded with the issuance of the reprimand letter, she might well have a point.  However, rather than accepting a letter of reprimand, Audette sought arbitration and, as a result, entered into a settlement agreement in which the Town agreed to remove the letter from her file.  While the Town

---

[13] Audette has not appealed the district court's decision on her age discrimination claim.

stated that "it will not rely on the reprimand for any future employment related purpose," Audette's representatives agreed that the settlement agreement "shall constitute a waiver of any action arising under either contract or statute with regard to the issuance of the reprimand." In light of the settlement agreement's explicit waiver provision, Audette may not point to the reprimand letter as the basis of an adverse employment action for her Massachusetts General Laws chapter 151 gender discrimination claim.[14]

Audette proposes a second adverse employment action -- that Chief Botieri intimidated her by making repeated, yet unfulfilled, threats to suspend her for her conduct. Appellees respond that Audette failed to raise this argument in the district

---

[14] We also note that even if the settlement agreement's waiver provision had not foreclosed this aspect of Audette's gender discrimination claim, she faces a second obstacle. In order to demonstrate discriminatory animus in this context, Massachusetts law requires Audette to demonstrate that "she was treated differently from another person, known as a comparator, who was not a member of her protected class, but who otherwise was 'similarly situated.'" Trs. of Health and Hosps. of City of Bos. v. Mass. Comm'n Against Discrimination, 871 N.E. 2d 444, 450 (Mass. 2007) (quoting Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1310 (Mass. 1997)). Audette has failed to proffer evidence of another Department employee whose circumstances were "substantially similar to [Audette's] 'in all relevant aspects' concerning the adverse employment decision." Id. (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)). If anything, evidence in the record demonstrates that no such "similarly situated" employee existed, since the only other employee involved in the incident at issue, Reid, was off-duty, while Audette was on-duty.

court and that we should not consider this argument for the first time on appeal.  We agree.  "[I]n the absence of extraordinary circumstances -- and none exist in this case -- 'legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.'"  B&T Masonry Constr. Co., Inc. v. Pub. Serv. Mut. Ins. 382 F.3d 36, 40 (1st Cir. 2004) (quoting Teamsters Union v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992)). Moreover, even if Audette had preserved the issue for appeal, she faces a second barrier.  Her only evidence of the threats comes from her unverified civil complaint, which cannot be considered for summary judgment purposes.  See Geshke v. Crocs, Inc., 740 F.3d 74, 78 n.3 (1st Cir. 2014) ("[U]nverified allegations in a complaint are not evidence.")

Because Audette has provided no admissible evidence of an adverse employment action, she has failed to establish a prima facie claim of gender discrimination.

Affirmed.